EUGENE KING v. THE STATE.

No. 19848. Delivered October 26, 1938.

The opinion states the case.

*Shead & Aycock,* of Longview, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

CHRISTIAN, JUDGE.—The offense is theft of cattle; the punishment, confinement in the penitentiary for four years.

On the 25th of September, 1937, Grant Williams lost a cow, which he later found in Charlie Rutland's pasture. Mr. Rutland testified that he found the cow in Prince Bush's field and drove her into his (witness') pasture. He later learned that she belonged to Williams and advised him of her presence in his pasture.

P. H. Hamilton, Jr., a witness for the State, testified that appellant and his brother, Jobie King, came to his home between 7 and 8 o'clock in the evening of the 25th of September, 1937, and offered him three dollars and fifty cents to haul a cow from Grant Williams' pasture to Marshall. Referring to the conversation he had with appellant and Jobie King, the witness said: "They said they had made a deal with Grant Williams for a cow. * * * They agreed to pay me three dollars, fifty cents. Both agreed that. They told me they wanted me to bring the cow to Marshall." The witness further testified that, accompanied by appellant and Jobie King, he drove to Williams' pas-

ture in his truck; that appellant and Jobie King went into the pasture and roped a cow; that the witness, appellant and Jobie King then proceeded to load the cow on the truck; that he then drove toward Marshall, accompanied by appellant and Jobie King. At this juncture we quote from the witness' testimony, as follows:

"While we were fixing to pass a man's house, known as Prince Bush, that lives on Grant Williams' place, they [referring to appellant and Jobie King] said 'Drive fast. If you don't they will see us, and tell Mr. Grant Williams.' Little Gene King [appellant] said that. He said 'When you pass Prince Bush's house drive fast, if you don't he may see us and tell Mr. Grant.' I said 'What difference does it make you, you made a deal with him, ought not to care.' They said 'That is all right. Go ahead and we will make it all right.' I then drove on top of a hill and told them to put the cow off. I made them put the cow off. Little Gene and Jobie. I did that because I had found out then it was a stolen cow. I didn't know it up until that time. They had told me it was a cow they had made a deal with Grant Williams for. * * * They asked me then to take them to Marshall and offered to pay me one dollar for that. We then came to Marshall and went up to Jack Daniels' house. * * * I don't know the exact hour we got there but it was around 11 o'clock at night. Jack was not there. We waited until he came. * * * He got there around 11:30 that night. Jobie and Eugene [appellant] were both there. They had a conversation with Jack Daniels. I heard that conversation. * * * Both of them were talking to Jack Daniels. I heard Eugene say something to Jack. He told him they had a cow they wanted to sell him. Jack asked where was the cow at and he said he didn't go out and buy cattle at night. Eugene King told him he would sell it to him at a cheap price and Jack told him he just wouldn't go out and buy it at night. * * * I didn't try to get Jack to go out and buy the cow. I never said anything about that."

The witness testified further that he did not expect to receive the agreed price for hauling the cow until appellant and Jobie King had sold her. We quote from his cross-examination, as follows: "After that they told me they would give me a dollar to carry them to Marshall. They did not give me the dollar. They said they would pay me that dollar. I drove the truck along and it was in the dead hours of midnight that they were going to see a man about selling him a cow. That man's name was Jack Daniels. I knew they didn't have any cow to sell, but I was going to bring them on up here for them to sell a cow

when I knew they did not have one to sell. I was depending upon them to pay me a dollar for doing that. * * * After I made them unload the cow they told me to carry them to town and they would give me a dollar if I would carry them to Jack Daniels' * * *. I knew what Eugene King was going to Daniels' house for that night. I knew he was going to talk about selling a cow. I was going there for the dollar. I was going for the dollar like I was going for the three and a half. After they put the cow off I thought I had better go with them. I knew I was going to tell about them stealing the cow. I told the law about it. I told the law after I was arrested. * * * No, sir, I didn't tell it until after they found out I hauled the cow. * * * It is not a fact that I went down there and got old Grant's cow and it fell out of my truck and that is the reason I did not steal it."

Jack Daniels, a witness for the State, testified to the effect that appellant, Jobie King and the witness Hamilton were at his house about 12 o'clock at night on September 25, 1937. It was his version that appellant and Jobie King offered to sell him a cow, but that Hamilton took no part in the conversation. He asked where the animal was located and appellant replied that it was above Red Oak, where it had fallen off of the truck. At this juncture we quote from Daniels' testimony: "They told me they would let me have her at my price if I went up there. The King boys told me that. Both of the King boys were in that conversation. * * * I told them that I would not go up there at that time of night if they would give her to me. * * * I asked where the cow was and he said 'Above Red Oak.' * * * I said 'I will come tomorrow,' and they said they would have to move her, and I went on in the house. * * * I saw the Hamilton boy the next night. He came out there with Mr. Felix Jones and Mr. Hall and three or four more laws."

We quote further from the testimony of the witness: "They said they had it [referring to the cow] tied with a log chain. They did not say it was close to Red Oak, that it was above Red Oak. This negro Hamilton did not say anything about it being his cow and none of them said where they got it."

Testifying in his own behalf, appellant denied that he had any connection with the theft. Also he denied that he went to the home of Daniels on the occasion in question, it being his version that he was at home at the time it was alleged the cow was stolen, where he remained during the entire night.

Several witnesses for appellant gave testimony supporting his theory of alibi.

In the charge the court left it to the jury to determine whether the witness Hamilton was an accomplice. Appellant timely and properly excepted to the charge on the ground that the jury were not instructed that the witness was an accomplice as a matter of law. We are of opinion that the testimony in its entirety shows beyond dispute that the witness was an accomplice. According to his own version, he was interested in the sale of the stolen cow to the extent that he expected to receive at least a dollar from the proceeds of the sale. Knowing that the animal was stolen, he drove appellant and Jobie King to the home of Daniels, no doubt with the hope that a sale would be consummated. He spoke no word to warn Daniels that appellant and his brother were endeavoring to sell him stolen property. In short, he actively aided appellant and Jobie King in their efforts to dispose of a cow he knew to have been stolen.

When applied to evidence, the term "accomplice" means a person who, either as a principal, accomplice, or accessory, is connected with the crime by an unlawful act or omission upon his part, transpiring either before, at the time of, or after the commission of the offense, and whether or not he was present and participated in the crime. Dooley v. State, 7 S. W. (2d) 96. The opinion is expressed that, in failing to respond to appellant's exception, the trial court fell into reversible error.

The judgment is reversed and the cause remanded.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.